# JUDGE KAPLAN 09 CIV 9083

LAW OFFICES OF GEORGE N. PROIOS, PLLC
Attorneys for Plaintiff
65 West 36th Street
New York, NY 10018-7702

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



ECF Case

---

Seacastle Container Leasing, LLC
Successor-in-interest to Interpool Limited
and its subsidiary and affiliated companies,

                           Plaintiff,

v.

Global Container Lines Limited,

                           Defendant.

09 CV

**VERIFIED COMPLAINT**

---

       Plaintiff Seacastle Container Leasing, LLC, Successor-in-interest to Interpool Limited,

and its subsidiary and affiliated companies (hereinafter "Seacastle"), by its attorneys, Law

Offices of George N. Proios, PLLC, as and for its Verified Complaint against Defendant Global

Container Lines Limited (hereinafter "Global"), alleges upon information and belief as follows:


## JURISDICTION

    1.    This Court has subject matter jurisdiction because the underlying claim herein is

an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil

Procedure and within the admiralty and maritime jurisdiction of this Court under 28 U.S.C. §

1333.

## THE PARTIES

2.      At all times material hereto, Plaintiff Seacastle was and still is a limited liability company organized and existing under the laws of Barbados.

3.      At all times material hereto, Defendant Global was and still is a corporation organized and existing under the laws of Delaware, and registered as a foreign corporation in the State of New York.

## THE BASIC FACTS

4.      The immediate predecessor to Seacastle, Interpool Limited, entered into a Membership and Equipment Leasing Agreement ("MELA") with Global on March 25, 2005. The MELA is a form of master agreement that sets out the terms and conditions applicable to all container leases and/or purchases by Global. (A copy of the MELA is attached as Exhibit A.). Seacastle has succeeded as lessor, under the MELA.

5.      Pursuant to the MELA, Seacastle and Global entered into a Lease Purchase Agreement on March 25, 2005 (the "March Lease") for the lease purchase of 500 container units (400 x 20ft; 100 x 40ft).  The March Lease was for a period of sixty months, during which Global was to make rental payments to Seacastle on the first day of each month, in advance, for each of the units.  (All Leases referred to herein are attached as Exhibit B.)

6.      Pursuant to the MELA, Seacastle and Global entered into a second Lease Purchase Agreement on December 13, 2005 (the "December Lease") for the lease purchase of 450 container units (200 x 20ft; 250 x 40ft).  The December Lease was for a period of sixty months, during which Global was to make rental payments to Seacastle on the first day of each month, in advance, for each of the units.

2

7.    In the MELA, Article 13, Global and Seacastle agreed to the jurisdiction of this Court over all disputes under the MELA as well as that venue of such disputes in this Court would be proper.

8.    Global failed to remit payments pursuant to either of the Leases and, on February 2, 2009, Seacastle issued a notice of default and demand for payment to Global for the past due balance of $147,780.  (Copies of all default and demand notices issued to Global are attached as Exhibit C.)

9.    In response, Global offered, and Seacastle accepted, a three-month payment plan for the past due amount, with the first installment ($50,902) to be paid on February 16th.  Global failed to honor its plan, however. (A copy of the payment plan is attached as Exhibit D.)

10.    Upon Global's default of the payment plan, as well as its failure to remit the regular monthly payment due on February 28th, Seacastle issued another notice of default and demand for payment on March 23rd.  Global did not respond.

11.    Seacastle sent subsequent notices of default and demands for payment on April 10th, July 28th and September 23rd, all without response from Global.

12.    On October 8, 2009, Seacastle issued a notice of termination of the March and December Leases, from which comes this action.

13.    Through September 14, 2009, Global owes Seacastle $360,648.00 in past due rental fees and interest accrued thereon, pursuant to Article 2 of the MELA, and Section 5 of the Lease Purchase Agreements.  Interest continues to accrue on the past due amounts at the rate of 1.5% per month.

3

## COUNT I
## BREACH OF CONTRACT - LEASE #3507

14.    Seacastle repeats paragraphs 1 through 13 as if fully set forth herein.

15.    On March 25, 2005, Global entered into an agreement for the lease of five hundred container units for a period of sixty months, for which Global agreed to pay monthly rental fees, one month in advance.

16.    Global has failed to remit payments against the lease for at least ten months and, therefore, has breached the terms of the contract.

Seacastle has suffered, and continues to suffer, great economic loss as a result of Global's breach of contract.  Seacastle, therefore, seeks relief for the damages suffered and asks this Court to award it a judgment in the amount of $197,736.00.

## COUNT II
## BREACH OF CONTRACT - LEASE #3531

17.    Seacastle repeats paragraphs 1 through 16 as if fully set forth herein.

18.    On December 13, 2005, Global entered into an agreement for the lease of four hundred and fifty container units for a period of sixty months, for which Global agreed to pay monthly rental fees, one month in advance.

19. Global has failed to remit payments against the lease for at least ten months and, therefore, has breached the terms of the contract.

Seacastle has suffered, and continues to suffer, great economic loss as a result of Global's breach of contract.  Seacastle, therefore, seeks relief for the damages suffered and asks this Court to award it a judgment in the amount of $ 162,912.00.

## COUNT III
## CONVERSION OF ASSETS

20.     Seacastle repeats paragraphs 1 through 19 as if fully set forth herein.

21.     Pursuant to Article 4 of the MELA, the "Lease shall not be deemed a sale or anything other than a true lease for any purpose. Each Unit shall at all times remain the property of [Seacastle], and [Global] shall acquire no ownership rights of any nature by virtue of th[e] Lease." Global has maintained physical possession of 950 container units belonging to Seacastle, without remitting rental fees, for almost a year despite repeated demands they be returned to Seacastle.

22.     In each of the notices of default and demands for payment issued to Global, Seacastle advised Global that it would demand the immediate return of all leased units if payment was not rendered. Global failed to remit payment, and ignored Seacastle's demand for the return of the units, tortiously converting the containers for its own benefit and enrichment.

23.     Repeated demands have been made to Global for information regarding the location and condition of Seacastle's container units, to no avail. Not only has Seacastle, the rightful owner of the container units, suffered economic damage from Global's failure to remit the rental payments, it has been further and irreparably damaged by the total loss of the physical container units.

Seacastle seeks relief for the damages suffered as a result of Global's tortious conversion of its property, and asks this Court to award it a judgment in the amount of $943,517.

WHEREFORE, Plaintiff Seacastle Container Leasing, LLC requests:

(a) As to Count I - Breach of Contract - Lease #3507, that judgment be entered in favor of

5

plaintiff Seacastle, and against defendant Global, in the amount of $197,736.00;

(b) As to Count I - Breach of Contract - Lease #3531, that judgment be entered in favor of plaintiff Seacastle, and against defendant Global, in the amount of $162,912.00;

(c) As to Count III - Conversion of Assets, that judgment be entered in favor of plaintiff Seacastle, and against defendant Global, in the amount of $943,517; and

(d) Such other relief as this Court may be deem appropriate.

Dated: New York, NY
       October 30, 2009

                                        Respectfully submitted,
                                        LAW OFFICES OF GEORGE N. PROIOS, PLLC
                                        Attorneys for Plaintiff


                                        By _____
                                             George N. Proios
                                             65 West 96th Street, 7th Floor
                                             New York, NY 10018-7702
                                             (212) 279-8880


OF COUNSEL:

J. Stephen Simms
John T. Ward
Simms Showers LLP
20 S. Charles Street - Suite 702
Baltimore, Maryland 21201
(410) 783-5795

*FIRST ORIGINAL*

# MEMBERSHIP AND EQUIPMENT
# LEASING AGREEMENT

This Lease Agreement entered into March 25, 2005 is between INTERPOOL LIMITED (hereinafter referred to as "Lessor"), a Barbados corporation whose principal place of business is at 633 Third Avenue, New York, New York, 10017 U.S.A., and GLOBAL CONTAINER LINES LIMITED (hereinafter referred to as "Lessee"), a Delaware limited liability company, whose principal place of business is at Garden City Center, 100 Quentin Roosevelt Boulevard, Garden City, NY 11530.

WHEREAS, Lessor has established an international pool of containers, chassis and other equipment for the carriage of cargo; and

WHEREAS, Lessee desires to lease equipment in said pool, and also desires equipment to be available for such use:

## W I T N E S S E T H

NOW, THEREFORE, in consideration of the mutual covenants and promises hereinafter set forth, Lessor and Lessee agree as follows:

### ARTICLE 1
### Leasing

Subject to the terms and conditions hereinafter set forth, Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor such containers, chassis or other equipment as may be listed or described in one or more addenda hereto executed from time to time by Lessor or any division of Lessor and Lessee (the "Units"). Such addenda may set forth any additional terms to which the parties may agree including, without limitation, lease terms, rental rates, pick-up and drop-off points and special conditions. This lease, together with all such addenda and all extensions, renewals, amendments and modifications hereinafter entered into between Lessor and Lessee are referred to collectively hereinafter as the "Lease". All containers, chassis or other equipment of Lessor that is picked up by or coming under the control of Lessee including all such equipment listed in all communications of Lessor to Lessee or its agents shall be subject to the terms and conditions of the Lease.

### ARTICLE 2
### Term, Rental

The term of lease for each Unit leased hereunder shall commence upon date of delivery of such Unit to Lessee or its representative and shall continue until the date set out in the applicable addendum. If the term is extended or renewed, all provisions of this Lease shall apply during any extension or renewal period.

Lessee shall pay all rental charges due under the Lease monthly in advance unless otherwise agreed in writing and all other charges as same shall become due hereunder. All payments hereunder shall be in currency of the United States. The obligation to make rental or any other payments to Lessor shall not be deemed waived, delayed, abated or eliminated for any reason, including, without limitation, force majeure, war, civil commotion, insurrection or the like which has the effects of denying Lessee the temporary or permanent use of any Unit. No payment to be made by Lessee hereunder shall be subject to reduction, limitation, impairment, set-off or counterclaim whether arising out of an alleged breach by Lessor or any third party or otherwise, provided, however, that this paragraph shall not be deemed a bar to Lessee's right to assert any claims to which it may be entitled against Lessor, in a separate proceeding.

The rental period for each Unit shall commence on the date of delivery of such Unit to Lessee or its representative, and shall end, at the expiration of the day that the Unit is taken off hire pursuant to Article 9 hereof. If redelivery of any Unit is impossible because of total loss or constructive total loss, then the rental period for such Unit shall end when Lessee tenders the replacement cost of such Unit to Interpool pursuant to Lessee's obligation under Article 9 hereof. Unless otherwise agreed, the minimum rental period for each Unit shall be thirty (30) days.

Lessee shall pay interest for late payment of any sum due Lessor under this Lease at the lesser of the highest legal rate or one-and-one-half percent (1½%) per month commencing on the tenth (10th) day after the day on which Lessee receives Lessor's invoice for such sum.



Exhibit A

## ARTICLE 3
### Disclaimer of Warranties

Each Unit subject to this Lease is leased AS IS, and Lessor warrants only that Lessee so long as it is not in default hereunder shall have quiet possession against any person claiming through Lessor. *LESSOR EXPRESSLY DISCLAIMS ANY WARRANTIES, EXPRESS OR IMPLIED, OF QUALITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE WITH RESPECT TO ANY UNIT AND HAS NOT MADE, AND SHALL NOT BE BOUND BY, ANY STATEMENT, AGREEMENT OR REPRESENTATION NOT SPECIFICALLY SET OUT IN WRITING AND SIGNED BY LESSOR. LESSOR SHALL NOT BE LIABLE FOR LOSS OF USE OF THE EQUIPMENT, LOSS OF TIME, INCONVENIENCE OR ANY OTHER CONSEQUENTIAL DAMAGES.*

## ARTICLE 4
### Ownership; Subleasing; Substitution; Encumbrances

This Lease shall not be deemed a sale or anything other than a true lease for any purpose. Each Unit shall at all times remain the property of Lessor, and Lessee shall acquire no ownership rights of any nature by virtue of this Lease. Some of the Units leased to Lessee may be owned by a third party and leased by it to Lessor. This Lease shall be subject and subordinate to any such leases. In the event that such third party becomes entitled to possession of any Unit, Lessee agrees, if requested by Lessor, to attorn to or enter into a new lease with such third party, the terms and conditions of which will be consistent with this agreement. The Units may be owned by a third party and managed by Lessor under a management agreement that limits the term for which the Units can be leased. In the event such third party becomes entitled to possession of such Units, Lessee will return them to such third party upon written request by Lessor and Lessor, at Lessee's request, will replace at Lessor's expense, the Units returned with comparable Units. Lessor can substitute other Units for some or all of the Units leased at any time providing the substitute Units are of a similar type and in as good condition as the Units leased. All costs connected with such substitution shall be borne by Lessor.

Lessee shall not sublet any Unit or assign this Lease or any rights hereunder without the prior written consent of Lessor except as required through the normal course of business. Lessee agrees to execute such documents as Lessor shall deem necessary in order to perfect its security interest in such assignment. Lessee shall not pledge, hypothecate, mortgage, create any security interest in or otherwise encumber or permit the encumbrance of any Unit other than any encumbrances that result from acts of lessor and any persons claiming against or through lessor. Lessee shall promptly at its own expense take all actions necessary to discharge any lien, charge or other encumbrance asserted by any party against any Unit arising after delivery of such Unit to Lessee. Notwithstanding the foregoing, Lessee shall have the right to contest in good faith by appropriate proceedings diligently pursued and available to Lessee, any lien, charge or other encumbrances asserted by any party against any Unit. Each Unit shall have Lessor's serial numbers and other identifying marks affixed thereto, which shall not be obliterated, altered, concealed or otherwise changed or hidden from view by Lessee so as to prevent or block access to such number or marks.

## ARTICLE 5
### Delivery of Equipment and Interchange of Units

Lessor will use its best efforts to make the Units available for delivery to Lessee on the dates specified in the Lease at the locations agreed upon by Lessor and Lessee, but Lessor shall not be liable for any delays in delivery beyond its reasonable control. The signature of Lessee or its representative on an equipment interchange receipt shall constitute conclusive evidence that the Unit to which same relates has been delivered to Lessee and that Lessee has examined the Unit and found it to be free of all damage (except as described otherwise in said receipt) and in good operating condition. Notwithstanding any entry in such receipt, nothing shall affect Lessee's obligation to pay the full rental charge or any other obligations under this Lease.

If the manufacturer fails to make any Unit available for Lessee's inspection in accordance with the terms and conditions of this Lease and any addenda hereto, then Lessee may at its option reject such Unit, in which event (a) the number of Units required to be leased shall be reduced by the number of Units so rejected by Lessee, and the rent due shall be reduced accordingly, and (b) Lessor shall refund to Lessee the Lease rental payments made hereunder with respect to all such rejected Units, if any.

Subject to any provision in the Lease requiring Lessee to maintain certain minimum numbers of Units or specific Units on lease for designated periods of time, Lessee may interchange Units leased with no fixed term to another ocean carrier provided that such interchange and carrier are approved in advance by Lessor and Lessee obtains an interchange receipt signed by the new carrier or its authorized agent acknowledging receipt of the Unit, noting any damages to the Unit and acknowledging its responsibility for damages upon redelivery to Lessor. An interchanged Unit shall not be deemed off-hired by lessor unless such receipt is received by Interpool or its agent.

## ARTICLE 6
### Operation, Maintenance and Repairs

Lessee shall at all times maintain the Units, at its own cost and expense in good and safe repair and operating condition in accordance with manufacturer's specifications and the International Convention for Safe Containers ("CSC"), International Institute of Container Lessors ("IICL") guidelines and U.S. FHWA inspection standards, as applicable. Lessee shall be responsible for all damages and changes in the condition of the Units, subject to the provisions of Article 9 hereof relating to such normal wear and tear on all Units and damage prior to delivery to Lessee noted on the on-hire equipment interchange receipt. Lessee's maintenance and repair obligations shall include, without limitation, washing and cleaning each Unit regularly inside and outside to prevent corrosion and spot painting and replacement of parts as may be necessary. Lessee shall comply with all loading limitations, handling procedures and operating instructions to prevent excessive impact or unbalanced loading. Lessee shall not use any Unit for storage or transportation of unsuitable contents which may damage the Unit, including, without limitation, unprotected corrosive substances, poorly secured materials or bulk commodities which may corrode, oxidize, severely dent, puncture, contaminate, stain or damage the Unit.

Lessee shall make no modifications, improvements, repairs or replacements, nor attach accessories or additions to any Unit, without the prior written consent of Lessor, (which shall not be reasonably refused) except as may be necessary to comply with the provisions of this Lease. All improvements, repairs, accessories and replacements made or attached to any Unit by lessee shall become part of the Unit and the Property of Lessor without Lessor incurring any liability therefor, or at Lessor's option shall be removed and the Unit shall be restored to its original condition at Lessee's expense. Lessee shall not change or supplement any identification marks on any Unit except as agreed upon in writing between Lessor and Lessee.

Lessee shall at all times comply with all conventions, laws, regulations or orders of federal, state, foreign and local governments and agencies which in any way affect any Unit or its use, operation or storage or which in any way affect this Lease and shall be liable for all fines, penalties, fees and interest thereon for failure to comply. Lessee shall comply in all respects with the CSC and shall have and exercise such responsibility as would otherwise be Lessor's as owner for maintenance, examination and repair. Lessee shall also comply in all respects with all applicable customs conventions that provide requirements relating to temporary admission, transport of goods under customs seal, maintenance of records or otherwise. Lessee shall at its own expense comply with all rules and practices of ports, depots, storage areas and transportation companies consistent with the other requirements herein.

## ARTICLE 7
### Taxes and Other Expenses

Lessee shall be responsible for all applicable sales, use, excise, property, stamp or other taxes, levies, import duties, charges or withholdings of any nature (together with penalties, fines or interest thereon) imposed against Lessor, Lessee or any Unit by any governmental or taxing authority if such taxes or charges are based upon the possession or use of the units by Lessee upon or with respect to any Unit, or upon the rentals, leasing, delivery, possession, use, operation, redelivery or other disposition thereof, or upon the rentals, receipts or earnings arising therefrom, excluding, however, (i) all such taxes, levies, import duties, charges and withholdings that are imposed and accrued with respect to a Unit prior to its delivery to Lessee and (ii) any taxes levied on Lessor's revenue, income, capital or business franchise. Lessee shall pay all other expenses relating to Units arising during the rental period including but not limited to expenses incurred in ports, depots or storage areas.

The above is subject to: (a) Lessor giving prompt notice to Lessee; and (b) Lessee having the right to contest in good faith by appropriate proceedings diligently pursued and available to Lessee, any such tax or charge.

## ARTICLE 8
### Risk of Loss

Subject to the provisions of Section 9 of the Lease, Lessee shall be liable for all loss and damage to each Unit subsequent to delivery to Lessee and prior to return to Lessor, regardless of when such damage may be discovered. In the event any Unit is damaged beyond repair, requisitioned by any governmental entity, lost or destroyed (a "Casualty Occurrence"), the Lessee shall pay to the Lessor the Depreciated Value for such Unit. The Depreciated Value shall be calculated based on an attached schedule when equipment is leased out. Depreciated Value shall be defined as the greater of the original cost of the unit to the Lessor or the current cost of a new unit of equipment. Lessee shall notify Lessor in writing immediately upon discovery of a Casualty Occurrence. Lessee shall pay rental charges pursuant hereto until the date that full settlement is made therefor. In the event that full settlement is not made within 30 days after the return date specified in the Lease, Lessee shall be liable for Lessor's standard daily rental charge for such Unit at the rate prevailing on each day after expiration of the aforesaid 30 days. Full settlement shall consist of proof of such loss satisfactory to Lessor and full payment of the depreciated value of the Unit. In the event of a Casualty Occurrence, Lessor may elect, but shall not be obligated to deliver another Unit of like kind and condition as the Unit suffering the Casualty Occurrence to Lessee in substitution therefor which shall become in all respects subject to the terms hereof.

After compliance with the foregoing to Lessor's satisfaction, and provided Lessee is not in default under this Lease, Lessee shall be subrogated to Lessor's rights with respect to any insurance policies or claims for reimbursement by others with respect to such loss, damage, theft or destruction.

## ARTICLE 9
### Redelivery of Units

Lessee shall redeliver each Unit, at Lessee's sole expense, to redelivery locations specified in the applicable addendum, or in the absence thereof to Interpool's authorized depot at any pool point listed in Lessor's most recent "Bulletin" or at any other location agreed to in advance in writing by Lessor. All redelivery points and dates specified in an addendum are subject to drop-off charges set forth therein, or in the absence thereof, as listed in the "Bulletin" in effect at the time of redelivery, or in the case of redeliveries to other locations, as specified by Lessor.

Upon return of a Unit, the Lessor and Lessee may execute a joint condition inspection report identifying and acknowledging any changes in the condition of the Unit subsequent to delivery. Lessee at its expense will have completed a cleanliness certificate issued by a recognized classification society, if requested by Lessor. Lessee shall return all Units to Lessor free of damage and in a condition evidencing the standard of maintenance required in paragraph 6 hereof, including, without limitation, compliance with all applicable laws and regulations applicable to the use and operation of the Unit. Notwithstanding the foregoing, Lessee shall not be responsible for (i) such normal wear and tear defined below as may reasonably be expected between delivery of the Unit and the date of its return or for (ii) such damage to the Unit that occurred prior to delivery to or on behalf of Lessee provided that in the event of a dispute, Lessee provides Lessor with a copy of the interchange receipt executed at the time of delivery to Lessee evidencing such damage. Normal wear and tear shall be determined in accordance with the current guidelines published by the International Institute of Container Lessors, International Convention for Safe Containers and U.S. FHWA (incorporated by reference herein) and may include light oxidation or light rust, random small dents and scratches on any side of a Unit caused by normal handling, ground storage, ship storage and securing, transport and loading and discharge consistent with good practice and in accordance with any specifications, handling procedures and operating instructions as may have been given by Lessor to Lessee. Notwithstanding the two preceding sentences, changes which could have been prevented by routine washing, routine lubrication, spot painting, or other normal repair or maintenance changes affecting security, water tightness, weather proof qualities, mechanical and/or electrical function of integral components, the integrity of design or structure, or by adherence to applicable regulatory or classification society requirements, or changes affecting the inside or outside dimensions or cubic content of a Unit, whether or not such changes add thereto or subtract therefrom, or changes which may threaten the safety of person or property, shall in no event constitute normal wear and tear, and Lessee shall be liable therefor. Lessor shall have the right to inspect all Units leased under this Lease at any reasonable time and at Lessor's sole cost, and upon Lessor's request, Lessee shall furnish Lessor with a list of all locations of Units, as of the most recent date possible and take all reasonable steps to make the Units available for inspection. With regard to chassis and trailer equipment, Lessee shall return such Units with a complete set of tires with a minimum tread of 4/32", with air to 85 p.s.i. for 24 hours. There will be no cuts to tire cord or flat spots within 4/32" from the surface. Minor oxidation only shall be acceptable, notwithstanding the provisions of this Lease otherwise exempting Lessee from liability for "normal wear and tear".

Units will be inspected at the expense of Lessee upon their return to the agreed-upon depot. If a Unit is in the required condition, the Unit shall be taken off-hire and the rental charge shall cease. If a Unit is returned to a depot location authorized by Lessor in damaged condition, Lessor or such depot will so advise Lessee upon discovery thereof. Lessor shall, in its sole discretion, have the right to require Lessee to repair the Unit, to authorize the repair of the Unit at Lessee's expense or to refrain from repairing the Unit and invoice Lessee for the amount of damages for which it is liable hereunder. In the event Lessor elects to authorize repairs, Lessee hereby authorizes Lessor to proceed with the repairs for which Lessee is liable hereunder at Lessee's expense at any repair facility of Lessor's choice. Lessee will execute any further documents required to authorize the repair facility to proceed and Lessee shall have the right to inspect any repairs so made. The Unit shall remain on-hire and Lessee shall continue to pay the rental charge until the date upon which Lessor and Lessee shall agree in writing upon the amount of the cost of the repairs for which Lessee is liable, and, in the event Lessor in its discretion elects to have such repairs performed, thereafter until the date (not greater than 10 business days thereafter) specified in such writing for completion of such repairs; provided, however, that in the event Lessee fails to authorize repairs for which Lessor claims it is responsible within 10 days of return of any Unit, Lessor, at its option, may either (i) promptly authorize repair (not greater than 10 business Unit shall be off-hired and rental charges shall cease upon approval of repair (not greater than 10 business days thereafter) or (ii) continue to make the Unit available for joint inspection with Lessee and to attempt to resolve damage disputes for a reasonable period of time at the expiration of which the Unit shall be off-hired and rental charges shall terminate. All handling expenses for the inspection and reinspection of Units and storage charges from the date of redelivery to the date of off-hire pursuant to the terms hereof shall be for the account of Lessee.

Lessee shall be liable to Lessor for the cost of repairing all damages for which Lessee is liable under this Lease whether or not Lessor elects to have such repairs made but in no event shall Lessee's liability for such damages exceed the depreciated value for a new Unit.

In the event that without obtaining the prior written consent of Lessor, Lessee shall fail to return any Unit for more than 120 days after the return date specified in the Lease, Lessor, without prejudice to any other rights hereunder may, in its sole discretion, elect to treat such Unit as lost, and Lessee shall pay to Lessor the

depreciated value of such Unit in accordance with the provisions of the Lease. Lessee shall pay Lessor's standard rental charge for such Unit at the rate prevailing on each day after expiration of the aforesaid 120 days, until the date that payment of such depreciated value is made. In the event that after payment of such depreciated value, Lessor shall elect and obtain repossession, Lessor shall, after deducting Lessor's expenses, return to Lessee such portion of such depreciated value as Lessor, in its sole discretion, shall deem to be the depreciated value that remains of such Unit on the date of repossession.

Should any Unit be redelivered to Lessor, or should Lessor repossess any Unit, and there shall at the time of such redelivery or repossession be in, upon or attached to such Unit any other things of value belonging to Lessee or in the custody or control of Lessee, Lessor is hereby authorized to take possession of such things of value and hold the same for Lessee either in Lessor's possession, or, in the exercise of Lessor's sole discretion, in public storage for the account of, and at the expense of, Lessee.

### ARTICLE 10
### Indemnity

Lessee shall defend, indemnify and hold Lessor, its agents and employees harmless from all claims, causes of action, liability, damage or loss (including, without limitation, expenses in connection with any claim or suit, such as reasonable attorney's fees, court cost and other expenses) arising directly or indirectly in any manner out of (a) any failure by Lessee to comply with its obligations under this Lease or any attempt by any third party, whether private or governmental, to impose upon Lessor liability for Lessee's acts or omissions, (b) any claim, whether private or governmental, for personal injury or death or for loss or damage to person, property, cargo or vessels or otherwise arising out of or incident to the manufacture, selection, possession, leasing, operation, control, use, storage, loading, unloading, moving, maintenance, delivery, or return of any Unit except if caused by the gross negligence or willful misconduct of Lessor, and (c) any forfeiture, seizure or impounding of, or charge or lien imposed or asserted against any Unit.

### ARTICLE 11
### Insurance

Lessee shall secure and maintain, at its own expense and with insurance companies acceptable to Lessor, amounts of insurance and types of coverage as shall be reasonably required from time to time by Lessor. Simultaneously with the execution of this Lease, Lessee shall furnish Lessor with certificates of insurance evidencing (a) all risk, loss and damage insurance (including mysterious disappearance/unexplained loss and war risks and strikes, riots and civil commotions risks) while on land, afloat or airborne, in transit or at rest anywhere in the world, in an amount equal to the depreciated value of all Units on lease to the Lessee, (b) comprehensive general liability insurance including contractual liability and broad form property damage for limits of not less than U.S. two million dollars ($2,000,000), combined single limit, and (c) automobile liability and property damage for limits of not less than U.S. two million dollars ($2,000,000) combined single limit. All insurance coverages shall (a) name Lessor as a joint assured, as its interest may appear, (b) include a loss payable clause in favor of Lessor providing that upon Lessor's giving notice to the insurer that Lessee is in default under the Lease, all claims are to be paid to Lessor, and (c) include an undertaking from the insurer that, notwithstanding the expiry or cancellation of such insurance, it shall, insofar as the interest of Lessor is concerned, remain in full force and effect until after the expiry of 30 days written notice of such expiry or cancellation from the insurer to Lessor. If the Lessee shall default in the payment of any premium in respect of any such insurance policies, the Lessor may, but shall not be obliged to, pay such premium, and in such event, Lessee shall repay the amount thereof to the Lessor on demand. Lessee hereby assigns to Lessor all of its present and future right, title and interest in and to all insurance proceeds now or hereafter payable to Lessee with respect to damage or to loss of the Units, including, without limitation, any recovery costs and "sue and labor" expenses, and further hereby appoints Lessor as its attorney-in-fact to take all necessary action at Lessee's expense and in Lessee's name to collect any such proceeds.

### ARTICLE 12
### Default

If any of the following events shall occur:
(a) Lessee shall fail to pay any sum to be paid hereunder within fifteen days after the same shall become due; (b) Lessee shall fail to observe or perform any other term or condition of this Lease or in any other lease or other agreement between Lessor (or any division or subsidiary thereof) and Lessee in the manner and at the time or times required herein and therein, and any such failure remains unremedied for thirty days after written notice thereof to Lessee by Lessor; (c) Lessee shall become unable to pay its debts generally as they become due, or shall make a general assignment for the benefit of creditors; or any proceedings shall be instituted by or against Lessee seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization or relief of debtors, or seeking appointment of a receiver, trustee or equivalent official for it or for any substantial part of its property or any involuntary proceedings that remain undismissed after 90 days, or Lessee shall take any corporate action authorizing any of the actions set forth above; (d) any distress, execution or other legal process shall be levied upon any of the Units; (e) following a material adverse change in Lessee's financial condition subsequent to the date hereof, either an obligation of the Lessee in excess of U.S. $1,000,000 for

the payment of borrowed money, for the deferred purchase price of property or for the payment of rent shall not be paid when due, the effect of which is to cause such obligation to become due prior to its stated maturity or Lessee shall permit any judgment against it in excess of U.S. $1,000,000 to remain unsatisfied for more than thirty days, unless covered by insurance; (f)  the seizure or nationalization of Lessee or a material part of Lessee's assets by a government instrumentality; or (g) a default by a guarantor shall occur under the terms of any guarantee agreement between Lessor and any third party guaranteeing the obligations of Lessee hereunder.

Then, in any such case, Lessor, at its option may:

(a)  proceed by appropriate court action or actions either at law, admirally or in equity to enforce performance by Lessee of the terms of this Lease and/or to recover from Lessee any and all damages or expenses, including reasonable attorney's fees, and all costs which Lessor shall have sustained by reason of Lessee's default or on account of Lessor's enforcement of its remedies hereunder and/or

(b)  by notice in writing to Lessee terminate Lessee's right to possession of some or all of the Units under this Lease (the "date of termination"), whereupon all rights of Lessee to or in the use of such Units shall absolutely cease, but Lessee shall remain liable as herein provided. Thereupon, Lessee shall notify Lessor immediately of the locations of all Units and Lessor by itself or by its agents without further notice, may, but shall be under no obligation to, retake the Units wherever found and irrespective of whether Lessee, any sublessee or any other entity may be in possession of the Units, all without prior demand and without legal process. For that purpose Lessor or its agents may enter upon any premises where the Units may be and may take possession thereof, without Lessor or its agents incurring any liability by reason of such retaking absent Lessor's gross negligence or willful misconduct, whether for the restoration of damage to property caused by such retaking or otherwise and thenceforth hold, possess and enjoy the Units free from any right of Lessee, or its successors or assigns, to hold, use or sell such Units for any purpose whatsoever, as hereinafter provided. This paragraph shall serve as the express authorization and instruction by Lessee to any depot or other custodian of any Unit hereunder to release the Unit or Units to Lessor or any authorized representative of Lessor, without further inquiry or liability to Lessee for such release, upon delivery to such depot or custodian of a copy of this Lease and a certification by Lessor (which may be made by telex) that Lessee is in default under this Lease and that Lessor is entitled to possession of the Unit(s). The rental charges specified in the Lease shall continue for a period of ten days following notice of termination. Thereafter for each Unit that has not been returned, the Lessee shall be liable for Lessor's then standard per diem rental until the date each Unit is returned to Lessor in accordance with the terms of this Lease. In addition to such rentals, Lessee shall also pay to Lessor,

(1)  any other actual damages which Lessor shall have sustained by reason of the breach of any terms of this Lease, plus

(2)  as damages for loss of a bargain and not as a penalty, an aggregate sum, which on the date of termination represents either (i) the excess of (x) the balance of total rental for such Unit for the entirety of the lease term, if any, specified with respect thereto (discounted at a per annum discount rate of 8%) from the dates the rentals would have otherwise been paid to the date of termination over (y) the present worth (discounted at 8%) on the date of termination of the fair rental value of such Unit to Lessor for the same period, or (ii) the amount of retroactive rental rate adjustment provided for in the Lease, if any, with respect to an early termination, plus

(3)  interest on the above sums at a rate equal to the maximum rate enforceable in accordance with applicable law from the date of termination until paid, plus

(4)  reasonable provision for expenses (including reasonable attorney's fees and costs) incurred by Lessor in taking possession of, relocating, overhauling or repairing the Units after repossession thereof as determined by Lessor to be required to place such Units in the location and in a condition required under this Lease.

In addition to the above sums, Lessee shall also remain liable for the depreciated value of each Unit not returned to Lessor within ten days from the notice of termination. Lessee shall in turn be credited with the lesser of the fair market value or the depreciated value of any Unit thereafter recovered, less expenses, as determined by Lessor.

Lessor shall have the option, whether or not it shall then have possession of a Unit, to conclusively establish the present worth of its fair rental value for all purposes by (a) an appraisal by Lessor based upon then current market conditions, costs of repair and relocation, (b) a bona fide lease of the Units which may be made by Lessor free from any and all claims of Lessee, or of any other party claiming by, through or under Lessee at law or in equity or in admiralty, or (c) a written appraisal by an independent appraiser selected by Lessor. Such appraisal shall also take into account current market conditions and costs of repair and relocation.

Lessor or its agents may sell all or some of the Units at public or private sale, with or without notice to Lessee, advertisement or publication, as Lessor may determine, or otherwise may dispose of, hold, use, operate or lease to others, all on such terms and conditions and at such place or places as Lessor may determine and all free and clear of any rights of Lessee and of any claim of Lessee in admiralty, in equity, at law or by statute, whether for loss or damage or otherwise.

No right or remedy conferred upon or reserved to Lessor by this Lease shall be exclusive of any other right or remedy available to Lessor. Lessee hereby waives any mandatory requirement of law now or hereafter in effect, which might limit or modify any of the remedies herein provided, to the extent that such waiver is permitted by law. Lessor may, at its election, waive any default and its consequences and rescind and annul any such notice of termination by notice to Lessee in writing to that effect. Notwithstanding the provisions of this Section, it is expressly understood and agreed by Lessee that time is of the essence in this Lease and that no waiver, rescission or annulment shall extend to or affect any other or subsequent default or impair any right or remedies of Lessor consequent thereto.

In the event of the occurrence of a Lessee default hereunder, if Lessor shall so elect by notice in writing to Lessee, Lessor may utilize such legal and/or equitable remedies as may be available to it, including, without limitation, replevin, injunction or any other provisional remedy designed to obtain possession of or protect the Units or any items thereof. Lessee hereby specifically waives, to the extent permitted by law, any hearing with respect to any such provisional remedy.

## ARTICLE 13
### Jurisdiction

Institution of litigation by any party pursuant to any separate arbitration agreement that may be entered into by the parties, shall not prejudice or waive Lessor's right to any of Lessor's remedies otherwise available, including, without limitation, termination, provisional remedies and repossession without judicial process. This Lease shall be deemed to have been made in New York regardless of the order in which the signature of the parties be affixed hereto. Lessee hereby irrevocably submits itself to the personal jurisdiction of the Supreme Court of the State of New York, New York County, of the United States of America, and to the personal jurisdiction of the United States District Courts for the Eastern and Southern Districts of New York (and to the personal jurisdiction of the appropriate appeals courts therefrom), for the purposes of any suit, action or other proceeding arising out of, or relating to this Lease and agrees that all claims in respect of such action or proceeding may be heard and determined in any such court. Process against Lessee may be served upon it by mailing a copy to Lessee (by registered or certified mail, if practicable) postage prepaid, or by telex to Lessee at its principal place of business indicated above or such other address as the Lessor shall have been notified in writing by Lessee. Lessee also designates Corporation Service Company, 375 Hudson Street, New York, New York 10014-2660, agent for the purpose of accepting service of any process within the State of New York, USA with respect to any claim or controversy arising out of or relating to, directly or indirectly, this Lease. After such agent has accepted such service of process such agent shall send Lessee written notice of such service and a copy of such process by certified or registered mail, return receipt requested. Service may be effected at Lessor's option either by the mailing referred to above or by service upon Corporation Service Company, as agent.

Lessee agrees that its submission to jurisdiction set forth above is made for the express benefit of the Lessor. Lessee further agrees that final judgment against Lessee in any such action or proceeding shall be conclusive, and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law, a certified or true copy of which judgment shall be conclusive evidence of the fact and the amount of any indebtedness or liability of Lessee therein described; provided that nothing herein shall affect the right of Lessee to serve legal process in any other manner permitted by law or affect the right of the Lessor to bring any action or proceeding against Lessee or its property in the courts of any other jurisdiction. Lessee shall pay all costs, including reasonable attorney's fees, incurred by Lessor in enforcing this Lease. No right or remedy herein granted shall be deemed in lieu of any legal or equitable remedy otherwise available.

## ARTICLE 14
### Immunity from Jurisdiction

To the extent Lessee has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process, Lessee hereby waives such immunity and agrees not to assert, by way of motion, as a defense, or otherwise, in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of the above-named courts, that it is immune from any legal process (whether through service or notice, attachment or arrest prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper, or that this Lease may not be enforced in or by such courts.

## ARTICLE 15
### Lessor's Liability

Lessor shall not be liable to Lessee or any other person for any failure or delay in the performance of any obligation due to events beyond its reasonable control, including, but not limited to, fire, storm, flood, earthquake, explosion, accidents, acts of the public enemy, sabotage, riots, civil disorder, strikes, lockouts, labor disputes, labor shortage, work stoppages, transportation embargoes or delays, failure or shortage of materials, supplies or equipment, failure of suppliers to deliver as requested, failure of repair facilities to finish repairs, acts of God, and acts or regulations or priorities of any government or its branches or agencies. Under no circumstances shall Lessor be liable and Lessee hereby waives any claim against Lessor for any lost profits or for special, consequential or exemplary damages, including, without limitation, damages to cargo, even if Lessor has been advised of the possibility of such damage.

## ~~ARTICLE 16~~
### ~~Financial Statements~~

~~Within sixty (60) days after the close of each of the first three quarters of Lessee's fiscal year, Lessee shall deliver to Lessor a copy of Lessee's and any guarantor's balance sheet, statement of profit and~~

loss and statement of changes in financial position for such quarter. Within 90 days after the close of Lessee's fiscal year, Lessee shall deliver to Lessor an audited balance sheet, statement of income and retained earnings, and statement of changes in financial position of Lessee and any guarantor as of the close of such fiscal year.

### ARTICLE 17
### General

This Lease is binding upon the parties and their respective successors and assigns. All matters relating to the construction, validity or enforceability of this Lease shall in all respects be governed by and construed in accordance with laws of the State of New York. This Lease contains the entire agreement between the parties with respect to the subject matter hereof and may not, subject to the provisions of Article 1 of this Lease, be amended, altered, modified or added to except by a writing signed by the party to be bound thereby. Lessor may assign all or any part of its obligations, right, title or interest in this Lease, including all rental charges due or to become due, provided, however, such assignment shall not affect Lessor's obligation to provide Lessee quiet possession and enjoyment of the units as provided in Article 3 hereof. Lessee hereby expressly consents to the application by Lessor of any payment credit to which it may be entitled hereunder (and any other funds belonging to or payable to Lessee in the custody of Lessor) toward payment obligations of Lessee hereunder or under any other agreement between Lessor and Lessee. The paragraph headings in these conditions are for convenience only and shall not be deemed to alter or affect any provision hereof.

Any notice required to be given under this Lease shall be effective upon dispatch to the party to whom such notice is directed at the address first above written, or at such other address as may have been communicated in writing unless otherwise specified herein to the other party or parties to this Lease in accordance with the provisions of this paragraph. All notices required to be given in writing shall be given either by hand delivery, by mail or by telex. Such mail shall in all cases be registered or certified mail. In the event that any of the terms and conditions of this Lease are not completed by insertion of the necessary words and/or figures, the parties agree to adopt Lessor's standard terms and conditions for comparable equipment, prevailing on the date on which Lessee executed the Lease, including, without limitation, rental charges, penalties for improper return and replacement values. Where there are two or more parties to the Lease as Lessee their liabilities under this Lease shall be joint and several. The provisions of this Lease are separable and any provisions found upon judicial interpretation or construction to be prohibited by law shall be ineffective to the extent of such prohibition without invalidating the remaining provisions hereof. No waiver of any remedy or other right under this Lease shall operate as a waiver of any other remedy or right, nor shall any single or partial exercise of any remedy or right preclude any other or further exercise thereof or of any other remedy or right.

GLOBAL CONTAINER LINES LIMITED:     INTERPOOL LIMITED:

BY: _____    BY: _____
      PRESIDENT              FRANK SELLIER
  KAZEM PARSIMA         MANAGING DIRECTOR
  (name and title of signing officer)        (name and title of signing officer)

APRIL 12, 2005

INTERPOOL LIMITED · 04-26-05

*FIRST ORIGINAL*

# CAI – INTERPOOL, LLC

## LEASE PURCHASE AGREEMENT

This Lease Purchase Agreement ("Agreement" or "Lease") dated as of March 25th, 2005 is between **CAI – INTERPOOL, LLC**, a Delaware limited liability company, with offices located at 550, Kearny Street, Suite 950, San Francisco, CA 94108, USA, as "Lessor", and **GLOBAL CONTAINER LINES LIMITED**, a Delaware limited liability company whose principal place of business is at Garden City Center, 100 Quentin Roosevelt Boulevard, Garden City, NY 11530.

Lessor and Lessee acknowledge and agree that all terms and conditions of that certain Membership and Equipment Leasing Agreement dated March 25th, 2005 between Interpool Limited, as Lessor and Global Container Line, as Lessee (the "MELA") shall be and hereby are incorporated herein by reference and shall be deemed to be included as if fully set forth herein with references to the "Lessor" therein deemed to refer to CAI-Interpool, LLC, and references to "Lessee" therein deemed to refer to Global Container Line. In the event of a conflict between the terms and conditions of this Agreement and the MELA, the terms and conditions of this Agreement shall prevail.

Lessor and Lessee expressly understand and agree that upon the execution hereof, Lessor will simultaneously assign all of Lessor's right, title and interest in and to this Agreement, specifically including but not limited to all terms and conditions of the MELA incorporated by reference herein, to Interpool Limited, a Barbados corporation, and Interpool Limited will assume all of Lessor's obligations hereunder.

**Account #3507**

1.  **QUANTITY AND TYPE:**

    This Agreement covers the lease purchase of 400 x 20' x 8' x 8'6" and 100 x 40' x 8' x 9'6" new dry van containers, ordered to be built by Singamas (the "Manufacturer"), in accordance with Manufacturer's standard specifications including reinforced cross members.

    The containers shall be supplied with Lessee's logo and serial numbers in the ranges of GCIU 205001 through GCIU 205400 and GCIU 451003 through GCIU 451102

    (each a "Container" and collectively the "Containers").

2.  **PRODUCTION AND DELIVERY TERMS:**

    The Containers shall be produced during May 2005.

    Delivery shall be effected free on truck to Lessee's designated depots in Mumbai, Dubai, and Karachi, commencing May /June 2005.

Exhibit B

# *CAI – INTERPOOL, LLC*

The Containers shall be delivered in IICL-5 condition. In the event of any damage to a Container noted by Lessee upon it's delivery such that the Container is no longer in IICL-5 condition, Lessee shall be responsible for up to the first $100 in costs to repair the Container so as to restore it back to IICL-5 condition.

The period commencing on the date the first Container is delivered through the end of the month of the date that the last Container is delivered is hereinafter referred to as the "Build-up-Period".

The period commencing on the first day of the month immediately following the month in which the Build-up-Period ends, through and including the expiration of the Rental Term (as defined below) of the last Container delivered hereunder, is hereinafter referred to as the "Locked-in-Period".

3. **DURATION OF LEASE:**

Each Container shall go on hire hereunder on the date it is delivered to Lessee. Rental Charges (as defined below) for each Container shall commence on the first calendar day of the month following the month in which the Container was delivered to Lessee, and shall continue for a period of the next five (5) years (the "Rental Term") and shall be payable in sixty (60) monthly instalments in accordance with the terms and conditions of Section 5, below.

4. **PER DIEM:**

The daily rental charges shall be:

U.S. $1.62 (one dollar and sixty-two cents) per 20' x 8' x 8'6" Container, and
U.S. $2.76 (two dollars and seventy-six cents) per 40' x 8' x 9'6" Container

(collectively, the "Rental Charges").

5. **PAYMENT TERMS:**

During the Build-up-Period the Rental Charges shall be payable against Lessor's monthly invoice 30 days from invoice date.

During the Locked-in-Period the Rental Charges shall be payable against Lessor's invoice on the first calendar day of each month in an amount equal to the Rental Charges to become due for such month (i.e. monthly in advance).

In the case of late payment, an interest charge of one and a half percent (1.5%) per month will be applied to the amount of such late payment until such payment is made. In addition, a lump sum late payment charge equal to 5% of the amount of such late payment, or the legal maximum amount, whichever is less, will be due at the time such late payment is made.

# CAI – INTERPOOL, LLC

6.    **LOSS AND TOTAL CONSTRUCTIVE LOSS:**

If any Container shall become lost, stolen, destroyed, damaged beyond repair or rendered permanently unfit for use for any reason, or in the event of any condemnation, confiscation, theft or seizure or requisition of title to or use of any Container (a "Lost Container" and each of the foregoing events, an "Event of Loss"), Lessee shall promptly notify Lessor of such Event of Loss and promptly pay to Lessor an amount equal to the Stipulated Loss Value ("SLV") of such Container. (For purposes hereof, a Container's SLV shall be equal to the present value of the remaining Rental Charges, plus the U.S. $1.00 purchase option price due with respect to the Lost Container, measured from the date of the Event of Loss through the end of the Rental Term, calculated by Lessor using a discount rate of five percent (5%) per annum).

Notwithstanding any such Event of Loss, Lessee's obligation to pay Rental Charges and other Lease charges with respect to the Lost Container shall continue until Lessor receives payment of the SLV for such Container (as well as payment of all Rental Charges and other Lease charges then due and outstanding with respect to such Container).

It is understood and agreed that any SLV payment relates to actual Events of Loss and do not and shall not be deemed to confer upon Lessee a purchase option in the Containers or any of them.

7.    **PURCHASE OPTION:**

Provided Lessee is not in default hereunder or under any other lease or other agreement with Lessor or any affiliate of Lessor and upon payment of all outstanding Rental Charges and other charges owed to Lessor, at the expiration of the Rental Term, Lessee has the option to purchase the Containers at a purchase price of U.S. $1.00 per Container.

In the event the purchase option is properly exercised, Lessor shall pass title for the Containers to the Lessee upon receipt of payment of the purchase price.

8.    **ASSIGNMENT:**

Lessor (and any assignee or subsequent assignee of Lessor) has the right, without the consent of Lessee, to assign this Lease in whole or in part to any third party, including without limitation, to Lessor's lender in connection with a financing transaction relating to the Containers. Without diminishing the foregoing, Lessee shall fully cooperate with Lessor (and any assignee or subsequent assignee of Lessor) and do whatever Lessor (or any such assignee) may require of Lessee to effect any such assignment or subsequent assignment.

# CAI – INTERPOOL, LLC

9. **SECURITY INTEREST:**

It is further acknowledged and agreed that this Lease is a true lease and that the relationship of the parties is that of lessor and lessee. Accordingly, the Lessor shall at all times remain the sole owner of the Containers.

Notwithstanding the foregoing, Lessee hereby grants to Lessor and Lessor hereby reserves to itself a security interest in and to the Containers as security for the full and complete payment and performance of all of Lessee's obligations hereunder. In addition to or in conjunction with, the rights and remedies available to Lessor hereunder, Lessor shall have all the rights and remedies provided to a secured party under the Uniform Commercial Code in force in the State of New York.

Lessee agrees to take whatever action and to do whatever things Lessor may reasonably request to assist Lessor in perfecting its security interest granted hereunder, including, without limitation, executing financing statements, and Lessee hereby appoints each of Lessor's officers as Lessee's lawful attorney-in-fact to do, at Lessor's option, all actions and things which the Lessor may deem necessary or desirable to effectuate its rights hereunder, including, without limitation, executing and filing financing statements in Lessee's name and on Lessee's behalf and otherwise perfecting any security interest granted hereby.

10. **CROSS-DEFAULT:**

A breach or default by Lessee of this Lease shall constitute a breach or default by Lessee of all other leases and other agreements between Lessee and Lessor or any affiliate of Lessor, and a breach or default by Lessee of any other lease or other agreement between Lessee and Lessor or any affiliate of Lessor, shall constitute a breach or default by Lessee of this Lease.

11. **FORCE MAJEURE:**

Lessor shall not be liable to Lessee or any other person for any failure or delay in the performance of any obligation due to events beyond its reasonable control, including but not limited to, fire, storm, flood, earthquake, explosion, accidents, acts of public enemy, sabotage, riots, civil disorder, strikes, lockouts, labor disputes, labor shortage, work stoppages, transportation embargoes or delays, failure or shortage of materials or of supplies or production of equipment, failure of suppliers to deliver as requested, failure of repair facilities to finish repairs, acts of God and acts or regulations or priorities of any government or its branches or agencies.

12. **DOCUMENTATION:**

This Lease Agreement may be executed in two counterparts, each of which so executed shall be deemed to be an original, and such counterparts together shall constitute but one and the same instrument.

# CAI – INTERPOOL, LLC

The parties hereto agree that to the extent this Lease constitutes "chattel paper" under the laws of the State of New York, then only that counterpart of the Lease designated as "FIRST ORIGINAL" or that is otherwise in the possession of the Lessor can transfer the Lessor's rights in the Lease.  All other counterparts of this Lease shall be designated as "SECOND ORIGINAL".

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE CAUSED THIS AGREEMENT TO BE EXECUTED IN THEIR RESPECTIVE NAMES BY THEIR DULY AUTHORISED OFFICERS.

**GLOBAL CONTAINER LINES LIMITED**

_____
Signature

_KAZEM PAKSIMA_
Name

_PRESIDENT_
Title

_APRIL 12. 2005_
Date

**CAI-INTERPOOL, LLC**

_Frank Sellier_
Signature

**FRANK SELLIER
PRESIDENT**
Name

_____
Title

_April 26, 2005_
Date

## ASSIGNMENT AND ASSUMPTION AGREEMENT

*FIRST ORIGINAL*

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") dated March 15th, 2005 is made by and between CAI-INTERPOOL, LLC, a Delaware limited liability company ("Assignor") and INTERPOOL LIMITED, a Barbados corporation ("Assignee").

### RECITALS

CAI-IP, LLC, a Delaware limited liability company, has entered into a certain Lease Purchase Agreement dated March 15th, 2005, account number 3507, by and between CAI-IP, LLC, as Lessor and Global Container Lines, Limited, as Lessee, (the "Lease") and CAI-IP, LLC, as Assignor herein, desires to assign and convey and Interpool Limited, a Barbados corporation, as Assignee herein, desires to assume, all of Assignor's rights and obligations under the Lease.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto do hereby agree as follows:

1. _Assignment and Delegation._ Assignor does hereby, without recourse, representation or warranty of any kind, grant, bargain, assign, transfer, sell, deliver and convey unto Assignee, its successors and assigns, to have and to hold forever, all of Assignor's right, title and interest in and to the Lease.

2. _Acceptance and Assumption._ Assignee hereby (i) accepts the assignment and transfer of Assignor's right, title and interest under Section 1 hereof and (ii) assumes all of the obligations, duties and responsibilities transferred and delegated to Assignee by Assignor under Section 1 hereof.

3. _Governing Law._ This instrument shall be governed by, and construed and interpreted in accordance with, the internal laws of the State of New York, without giving effect to the conflicts of laws provisions thereof.

4. _Counterparts._ This Agreement may be executed in separate counterparts, each of which when so executed and delivered shall be an original for all purposes, but all such counterparts shall constitute but one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have each caused this Agreement to be duly executed on the day and year first above written.

INTERPOOL LIMITED

Signed: _Frank Sellier_

Name: **FRANK SELLIER MANAGING DIRECTOR**

Title: _____

Date: _April 26, 2005_

CAI-INTERPOOL, LLC

Signed: _Frank Sellier_

Name: **FRANK SELLIER PRESIDENT**

Title: _____

Date: _April 26, 2005_

# CAI – INTERPOOL, LLC

*FIRST ORIGINAL*

## LEASE PURCHASE AGREEMENT

This Lease Purchase Agreement ("Agreement" or "Lease") dated as of December 13th, 2005 is between **CAI – INTERPOOL, LLC**, a Delaware limited liability company, with offices located at One Embarcadero Center, Suite 2101, San Francisco, CA 94111, USA, as "Lessor", and **GLOBAL CONTAINER LINES LIMITED**, a Delaware limited liability company whose principal place of business is at Garden City Center, 100 Quentin Roosevelt Boulevard, Garden City, NY 11530.

Lessor and Lessee acknowledge and agree that all terms and conditions of that certain Membership and Equipment Leasing Agreement dated March 25th, 2005 between Interpool Limited, as Lessor and Global Container Line, as Lessee (the "MELA") shall be and hereby are incorporated herein by reference and shall be deemed to be included as if fully set forth herein with references to the "Lessor" therein deemed to refer to CAI-Interpool, LLC, and references to "Lessee" therein deemed to refer to Global Container Line. In the event of a conflict between the terms and conditions of this Agreement and the MELA, the terms and conditions of this Agreement shall prevail.

Lessor and Lessee expressly understand and agree that upon the execution hereof, Lessor will simultaneously assign all of Lessor's right, title and interest in and to this Agreement, specifically including but not limited to all terms and conditions of the MELA incorporated by reference herein, to Interpool Containers Limited, a Barbados corporation, and Interpool Containers Limited will assume all of Lessor's obligations hereunder.

**Account #3531**

1.  **QUANTITY AND TYPE:**

    This Agreement covers the lease purchase of 200 x 20' x 8' x 8'6" and 250 x 40' x 8' x 9'6" new dry van containers, ordered to be built by Singamas (the "Manufacturer"), in accordance with Manufacturer's specifications SP-GCLF-20 per 20' x 8' x 8'6" container and SP-GCLF-HC per 40' x 8' x 9'6" container, both dated November 29, 2005.

    The containers shall be supplied with Lessee's logo and serial numbers in the ranges of GCIU 205401 through GCIU 205600 per 20' x 8' x 8'6" container, and GCIU 451103 through GCIU 451352 per 40' x 8' x 9'6" container

    (each a "Container" and collectively the "Containers").

2.  **PRODUCTION AND DELIVERY TERMS:**

    The Containers shall be produced from December 2005 through January 2006.

    Delivery shall be effected free on truck to Lessee's designated depots in Mumbai, Dubai, and Karachi, commencing January through February 2006.

# CAI – INTERPOOL, LLC

The Containers shall be delivered in IICL-5 condition. If upon delivery of a Container to Lessee, Lessee identifies damage to the Container such that the Container is no longer in IICL-5 condition, Lessee shall be responsible for up to the first $100 in costs to repair the Container so as to restore it back to IICL-5 condition.

The period commencing on the date the first Container is delivered through the end of the month of the date that the last Container is delivered is hereinafter referred to as the "Build-up-Period".

The period commencing on the first day of the month immediately following the month in which the Build-up-Period ends, through and including the expiration of the Rental Term (as defined below) of the last Container delivered hereunder, is hereinafter referred to as the "Locked-in-Period".

3.   **DURATION OF LEASE:**

Each Container shall go on hire hereunder on the date it is delivered to Lessee. Rental Charges (as defined below) for each Container shall commence on the first calendar day of the month following the month in which the Container was delivered to Lessee, and shall continue for a period of the next five (5) years (the "Rental Term") and shall be payable in sixty (60) monthly instalments in accordance with the terms and conditions of Section 5, below.

4.   **PER DIEM:**

The daily rental charges shall be:

U.S. $1.14 (one dollar and fourteen cents) per 20' x 8' x 8'6" Container, and
U.S. $1.96 (one dollar and ninety-six cents) per 40' x 8' x 9'6" Container

(collectively, the "Rental Charges").

5.   **PAYMENT TERMS:**

During the Build-up-Period the Rental Charges shall be payable against Lessor's monthly invoice 30 days from invoice date.

During the Locked-in-Period the Rental Charges shall be payable against Lessor's invoice on the first calendar day of each month in an amount equal to the Rental Charges to become due for such month (i.e. monthly in advance).

In the case of late payment, an interest charge of one and a half percent (1.5%) per month will be applied to the amount of such late payment until such payment is made. In addition, a lump sum late payment charge equal to 5% of the amount of such late payment, or the legal maximum amount, whichever is less, will be due at the time such late payment is made.

# CAI – INTERPOOL, LLC

6. **LOSS AND TOTAL CONSTRUCTIVE LOSS:**

If any Container shall become lost, stolen, destroyed, damaged beyond repair or rendered permanently unfit for use for any reason, or in the event of any condemnation, confiscation, theft or seizure or requisition of title to or use of any Container (a "Lost Container" and each of the foregoing events, an "Event of Loss"), Lessee shall promptly notify Lessor of such Event of Loss and promptly pay to Lessor an amount equal to the Stipulated Loss Value ("SLV") of such Container. (For purposes hereof, a Container's SLV shall be equal to the present value of the remaining Rental Charges, plus the U.S. $1.00 purchase option price due with respect to the Lost Container, measured from the date of the Event of Loss through the end of the Rental Term, calculated by Lessor using a discount rate of five percent (5%) per annum).

Notwithstanding any such Event of Loss, Lessee's obligation to pay Rental Charges and other Lease charges with respect to the Lost Container shall continue until Lessor receives payment of the SLV for such Container (as well as payment of all Rental Charges and other Lease charges then due and outstanding with respect to such Container).

It is understood and agreed that any SLV payment relates to actual Events of Loss and do not and shall not be deemed to confer upon Lessee a purchase option in the Containers or any of them.

7. **PURCHASE OPTION:**

Provided Lessee is not in default hereunder or under any other lease or other agreement with Lessor or any affiliate of Lessor and upon payment of all outstanding Rental Charges and other charges owed to Lessor, at the expiration of the Rental Term, Lessee has the option to purchase the Containers at a purchase price of U.S. $1.00 per Container.

In the event the purchase option is properly exercised, Lessor shall pass title for the Containers to the Lessee upon receipt of payment of the purchase price.

8. **ASSIGNMENT:**

Lessor (and any assignee or subsequent assignee of Lessor) has the right, without the consent of Lessee, to assign this Lease in whole or in part to any third party, including without limitation, to Lessor's lender in connection with a financing transaction relating to the Containers. Without diminishing the foregoing, Lessee shall fully cooperate with Lessor (and any assignee or subsequent assignee of Lessor) and do whatever Lessor (or any such assignee) may require of Lessee to effect any such assignment or subsequent assignment.

# CAI – INTERPOOL, LLC

9.  ## SECURITY INTEREST:

It is further acknowledged and agreed that this Lease is a true lease and that the relationship of the parties is that of lessor and lessee. Accordingly, the Lessor shall at all times remain the sole owner of the Containers.

Notwithstanding the foregoing, Lessee hereby grants to Lessor and Lessor hereby reserves to itself a security interest in and to the Containers as security for the full and complete payment and performance of all of Lessee's obligations hereunder. In addition to or in conjunction with, the rights and remedies available to Lessor hereunder, Lessor shall have all the rights and remedies provided to a secured party under the Uniform Commercial Code in force in the State of New York.

Lessee agrees to take whatever action and to do whatever things Lessor may reasonably request to assist Lessor in perfecting its security interest granted hereunder, including, without limitation, executing financing statements, and Lessee hereby appoints each of Lessor's officers as Lessee's lawful attorney-in-fact to do, at Lessor's option, all actions and things which the Lessor may deem necessary or desirable to effectuate its rights hereunder, including, without limitation, executing and filing financing statements in Lessee's name and on Lessee's behalf and otherwise perfecting any security interest granted hereby.

10.  ## CROSS-DEFAULT:

A breach or default by Lessee of this Lease shall constitute a breach or default by Lessee of all other leases and other agreements between Lessee and Lessor or any affiliate of Lessor, and a breach or default by Lessee of any other lease or other agreement between Lessee and Lessor or any affiliate of Lessor, shall constitute a breach or default by Lessee of this Lease.

11.  ## FORCE MAJEURE:

Lessor shall not be liable to Lessee or any other person for any failure or delay in the performance of any obligation due to events beyond its reasonable control, including but not limited to, fire, storm, flood, earthquake, explosion, accidents, acts of public enemy, sabotage, riots, civil disorder, strikes, lockouts, labor disputes, labor shortage, work stoppages, transportation embargoes or delays, failure or shortage of materials or of supplies or production of equipment, failure of suppliers to deliver as requested, failure of repair facilities to finish repairs, acts of God and acts or regulations or priorities of any government or its branches or agencies.

12.  ## DOCUMENTATION:

This Lease Agreement may be executed in two counterparts, each of which so executed shall be deemed to be an original, and such counterparts together shall constitute but one and the same instrument.

# CAI – INTERPOOL, LLC

The parties hereto agree that to the extent this Lease constitutes "chattel paper" under the laws of the State of New York, then only that counterpart of the Lease designated as "FIRST ORIGINAL" or that is otherwise in the possession of the Lessor can transfer the Lessor's rights in the Lease.  All other counterparts of this Lease shall be designated as "SECOND ORIGINAL".


IN WITNESS WHEREOF, THE PARTIES HERETO HAVE CAUSED THIS AGREEMENT TO BE EXECUTED IN THEIR RESPECTIVE NAMES BY THEIR DULY AUTHORISED OFFICERS.


**GLOBAL CONTAINER LINES LIMITED**

_____
Signature

_____
Name    KAZEM PAKSIMA

_____
Title    PRESIDENT

_____
Date    December 20, 2005


**CAI-INTERPOOL, LLC**

_____
Signature    Frank Sellier

_____
Name    **FRANK SELLIER**
        **PRESIDENT**

_____
Title

_____
Date    Jan 05, 2006

FIRST ORIGINAL **ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") dated December 13th, 2005 is made by and between CAI-INTERPOOL, LLC, a Delaware limited liability company ("Assignor" or "CAI-IP, LLC") and INTERPOOL CONTAINERS LIMITED, a Barbados corporation ("Assignee").

## RECITALS

CAI-IP, LLC, a Delaware limited liability company, has entered into a certain Lease Purchase Agreement dated as of December 13th, 2005, account number 3531, by and between CAI-IP, LLC, as Lessor and Global Container Lines Limited, as Lessee, (the "Lease") and CAI-IP, LLC, as Assignor herein, desires to assign and convey and Interpool Containers Limited, a Barbados corporation, as Assignee herein, desires to assume, all of Assignor's rights and obligations under the Lease.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto do hereby agree as follows:

1. <u>Assignment and Delegation.</u> Assignor does hereby, without recourse, representation or warranty of any kind, grant, bargain, assign, transfer, sell, deliver and convey unto Assignee, its successors and assigns, to have and to hold forever, all of Assignor's right, title and interest in and to the Lease.

2. <u>Acceptance and Assumption.</u> Assignee hereby (i) accepts the assignment and transfer of Assignor's right, title and interest under Section 1 hereof and (ii) assumes all of the obligations, duties and responsibilities transferred and delegated to Assignee by Assignor under Section 1 hereof.

3. <u>Governing Law.</u> This instrument shall be governed by, and construed and interpreted in accordance with, the internal laws of the State of New York, without giving effect to the conflicts of laws provisions thereof.

4. <u>Counterparts.</u> This Agreement may be executed in separate counterparts, each of which when so executed and delivered shall be an original for all purposes, but all such counterparts shall constitute but one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have each caused this Agreement to be duly executed on the day and year first above written.

CAI-INTERPOOL, LLC

Signed: _Frank Sellier_

Name: **FRANK SELLIER**
**PRESIDENT**

Title: _____

Date: _Jan 05, 2006_

INTERPOOL CONTAINERS LIMITED

Signed: _Frank Sellier_

Name: _FRANK SELLIER_
**MANAGING DIRECTOR**

Title: _____

Date: _Jan 05, 2006_



**Seacastle Container Leasing, LLC**
1 Maynard Drive
Park Ridge, NJ 07656
Tel: (201) 391-0800
Fax: (201) 391-0356

February 2, 2009

Global Container Lines Ltd
Attn: Kazem Paksima, President
Garden City Center
100 Quentin Roosevelt Blvd
Garden City, NY 11530

Dear Kazem Paksima:

Please be advised that your good company has failed to remit payments to us as per the terms of the contract. Unfortunately, we are unable to allow your account to fall further behind on payment terms.

Currently, your account is reflecting a past due balance of $147,780.00. In addition, there are current invoices in the amount of $50,902.00 that will become due as of February 28, 2009. In order to avoid your leases being terminated for default, and your loss of all rights to use the equipment, payment in the amount of $147,780.00 must be made by February 9, 2009. There can be no excuses.

Please note that failure to rectify this situation based on this notice will result in a default of all contracts with Seacastle Container Leasing LLC, at which time we will require that all equipment be returned to Seacastle immediately at Global Container Lines Ltd's expense. Please know that we will pursue all legal remedies available to us. Your company will be responsible at that time for all losses we sustain, together with interest, and attorney's fees.

We urge you to remedy this situation immediately. We have been more than patient to date.

Regards,

*Lisa D Leach/KP*

Lisa D. Leach
Vice-President & General Counsel

cc:     Frank Roovers
        Ron Roberts
        Kara Petersen

Exhibit C

**Seacastle Container Leasing, LLC**
1 Maynard Drive
Park Ridge, NJ 07656
Tel: (201) 391-0800
Fax: (201) 391-0356

**Seacastle**

March 23, 2009

Global Container Lines Ltd
Attn: Kazem Paksima, President
Garden City Center
100 Quentin Roosevelt Blvd
Garden City, NY 11530

Dear Kazem Paksima:

Your company is in default due to its continuing failure to remit payments to us as per the terms of the contract. In addition, you have not adhered to the agreement that was reached following the first demand letter dated February 2, 2009. A proposed payment plan was sent in writing signed by Ali Paksima on February 5, 2009 which your company has failed to honor. We are unwilling to allow your account to fall further behind on payment terms.

Currently, your account is reflecting a past due balance of $147,780.00. In addition, there are current invoices in the amount of $49,260.00 that will become due as of March 31, 2009. In order to avoid your leases being terminated for default, and your loss of all rights to use the equipment, payment in the amount of $147,780.00 must be made by March 27, 2009. There can be no excuses.

Please note that failure to rectify this situation based on this notice will result in a default of all contracts with Seacastle Container Leasing LLC, at which time we will require that all equipment be returned to Seacastle immediately at Global Container Lines Ltd's expense. Please know that we will pursue all legal remedies available to us. Your company will be responsible at that time for all losses we sustain, together with interest, and attorney's fees, and the replacement value of any equipment not redelivered to us per the contract terms. Additionally, a default under our leases will likely cross-default into other credit facilities, causing operational difficulties for your company.

We await your immediate payment on or before March 27, 2009. In addition, please supply an equipment location list reflecting the current location of all Seacastle leased equipment. We required that an updated list be provided weekly until such time as your account is restored to good status.

We look forward to immediate payment, and to receipt of a current equipment location list.

Regards,

Lisa D. Leach/kp

Lisa D. Leach
Vice-President & General Counsel

cc:    Frank Roovers
       Ron Roberts
       Kara Petersen

Enc.



**Seacastle Container Leasing, LLC**
1 Maynard Drive
Park Ridge, NJ 07656
Tel: (201) 391-0800
Fax: (201) 391-0356

April 10, 2009

Global Container Lines Ltd
Attn: Kazem Paksima, President
Garden City Center
100 Quentin Roosevelt Blvd
Garden City, NY 11530

Dear Mr. Paksima:

Your company has not adhered to various payment plans proposed to restore your account to good standing. The original payment plan outlined in Mr. Ali Paksima's letter on February 5, 2009 had not been honored. A subsequent commitment was made by Hormoz Shayegan to pay $50,902.00 by March 31, 2009. Unfortunately, no payment has been received. We cannot allow your account to fall further behind on payment terms, or permit the continued use of our equipment without payment.

Currently, your account is reflecting a past due balance of $197,040.00. In addition, there are current invoices in the amount of $50,902.00 that will become due as of April 30, 2009. In order to avoid your leases being terminated for default, and your loss of all rights to use the equipment, payment in the amount of $197,040.00 must be made by April 15, 2009. There can be no excuses.

Please note that failure to rectify this situation immediately will result in a default of all contracts with Seacastle Container Leasing LLC, at which time we will require that all equipment be returned to Seacastle immediately at Global Container Lines Ltd's expense. Please know that we will pursue all legal remedies available to us to ensure payment, and satisfaction of your obligations under the leases. Your company will be responsible for any losses we sustain, together with interest, and attorney's fees, and the value of any equipment not redelivered to us per the contract terms. These costs will greatly increase your liability under these leases.

We regret this situation, but have only asked that you honor your contractual obligation to us with timely payments. I urge you to rectify this situation immediately, and await your immediate payment on or before April 15, 2009, together with an equipment location list.

Sincerely,

Lisa D. Leach
Vice-President & General Counsel

cc:    Frank Roovers
       Ron Roberts
       Kara Patersen

Enc.



**Seacastle Container Leasing, LLC**
1 Maynard Drive
Park Ridge, NJ 07656
Tel: (201) 391-0800
Fax: (201) 391-0356

July 28, 2009

Global Container Lines Ltd
Attn: Kazem Paksima, President/Mr. Hormoz Shayegan
Garden City Center
100 Quentin Roosevelt Blvd
Garden City, NY 11530

Dear Kazem Paksima and Mr. Shayegan:

Please be advised that your good company has failed to remit payments to us as per the terms of the contract. We have been attempting to reach your company but have not received a response as to the status of the July payment nor a plan to get your account caught up to date. Unfortunately, we are unable to allow your account to fall further behind on payment terms.

Currently, your account is reflecting a past due balance of $200,324.00. In addition, there are current invoices in the amount of $50,902.00 that will become due as of July 31, 2009. In order to avoid your leases being terminated for default, and your loss of all rights to use the equipment, payment in the amount of $200,324.00 must be made by July 31, 2009. There can be no excuses.

Please note that failure to rectify this situation based on this notice will result in a default of all contracts with Seacastle Container Leasing LLC, at which time we will require that all equipment be returned to Seacastle immediately at Global Container Lines Ltd's expense. Please know that we will pursue all legal remedies available to us. Your company will be responsible at that time for all losses we sustain, together with interest, and attorney's fees.

We urge you to remedy this situation immediately. In the meantime, please immediately provide us with a list identifying the current location of all Seacastle equipment, along with a list of your current depots.

Regards,

Lisa D. Leach
Vice-President & General Counsel

cc:    Frank Roovers
       Ron Roberts
       Kara Petersen



**Seacastle Container Leasing, LLC**
1 Maynard Drive
Park Ridge, NJ 07656
Tel: (201) 391-0800
Fax: (201) 391-0356

September 23, 2009

Global Container Lines Ltd
Garden City Center
100 Quentin Roosevelt Blvd
Garden City, NY 11530
Attn: Mr. Hormoz Shayegan and Mr. Ali Paksima

Re:     **Continuing Default of Seacastle Container Lease Obligations**

Gentlemen:

Due to Global Container Lines Ltd ("GCLL") continuing default of its lease obligations and its failure to cure these defaults as required by Seacastle Container Leasing (assignees and successor in interest to Interpool Containers Limited) ("Seacastle") and its failure to respond to our inquiries on this subject, GCLL's lease rights under Addendum 3507 and 3531 and the Membership and Equipment Leasing Agreement ("MELA") dated April 12, 2005 are terminated immediately.

Your failure to honor your contractual commitments with timely payments has forced Seacastle to implement the default provisions set forth in Article 12 in the MELA which reads as per attached. As provided in Article 12 of the MELA, GCLL is no longer authorized to possess or use Seacastle's containers. An equipment location list should be provided as soon as possible, and notice sent to your depots by you authorizing the release of our equipment to us.

Immediate arrangements must be made to redeliver all containers to an authorized Seacastle depot, as set forth in each Addendum. Per Article 12, GCLL will be responsible to Seacastle for the depreciated value of any Containers not redelivered to us within ten (10) days.

In addition, GCLL remains responsible for payment of all amounts currently owed to Seacastle under these leases (currently $260,486.00), together with damage and repair charges for each redelivered container, any handling, repositioning, storage or depots costs, remaining unpaid lease balances for the remaining term, and other charges as provided in your lease agreements, together with a service charge of 1½% per month on all unpaid balances, as authorized in the MELA. Under the terms of our agreements, GCLL will further be responsible for all attorney's fees and legal costs incurred by Seacastle to enforce its rights and remedies under the lease and to secure the safe return of our containers. Seacastle will take every possible action and exercise

all available remedies to recover our equipment and all amounts due and arising from GCLL's failure to honor its contractual obligations and legal commitments. Your failure to honor your contractual obligations will result in a significant increase in costs to GCLL and will no doubt have a detrimental effect on your operations.

Mr. Mike Jones will be in contact with you to coordinate the immediate redelivery of our equipment. Please provide him with an equipment list within the next 24 hours outlining the most recent location of our equipment and when you will redeliver it, with additional equipment lists to be provided weekly and upon our request. Please contact your depots immediately, authorizing the immediate release of any Seacastle equipment to us.

We regret that this action is necessary. We have only asked that you honor your commitments and remit payment on a timely basis for the use of our equipment.

Sincerely,

Lisa D. Leach
Vice-President & General Counsel

cc     Joseph Kwok, CEO
       Ron Roberts, VP of Global Sales & Marketing
       Mike Jones, Regional VP, North America
       Credit Committee Members

FACSIMILE

# SIMMS SHOWERS LLP

TWENTY SOUTH CHARLES STREET
BALTIMORE, MARYLAND 21201

PHONE (410) 783-5795        FACSIMILE (410) 510-1789

Date:        October 8, 2009

To:          Global Container Lines Ltd.                           <u>516-222-0377</u>

             Attention: Mr. Hormoz Shayegan and Mr. Ali Paksima

From:        J. Stephen Simms
             E-Mail jssimms@simmsshowers.com

Re:          Seacastle - Default of Leases by Global Container Lines  (herein, the "Leases")

---

Gentlemen:

We are maritime lawyers instructed by Seacastle Container Leasing LLC ("Seacastle"), and write to follow Seacastle's September 23, 2009 and related default notices to you.

As you know, neither Global or any of its agents has following your default and termination of the Seacastle leases, any further right to use or possess the Seacastle equipment.

Seacastle has instructed us to proceed immediately to reclaim all Seacastle equipment and to recover all amounts due Seacastle.

This includes, all equipment wherever located, loaded or empty.  Any equipment aboard vessels will be arrested, as will be those vessels for trespass to and conversion and unauthorized use of the equipment.

This may result in significant disruptions to your customer relationships.  Consequently, Seacastle demands that, in order to minimize its damages, that Global return to Seacastle immediately all equipment and provide us immediately with the locations of all Seacastle equipment for recovery and instructions to shippers about return of that equipment.

Please accordingly respond by earliest return.  Whether or not you respond, Seacastle is proceeding.



**Global Container Lines**

Global Container Lines Limited

100 Quentin Roosevelt Boulevard, Garden City, NY 11530, USA

TEL +1 (516) 222 0707  FAX +1 (516) 222 0377  E-MAIL admin@gogcl.com  WEB www.gogcl.com

February 5, 2009

Seacastle Container Leasing, LLC
1 Maynard Drive
Park Ridge, NJ 07656

Attn:     Ms. Kara Petersen

This is to confirm our telephone conversation of today, following Lisa D. Leach's letter of February 2, 2009, we confirm the following schedule which was mutually agreed:

1) The outstanding amount of $ 147,780 will be paid in 3 installments as follows:
   a) Feb 16, 2009   $   50,902.00
   b) Mar 16, 2009       50,902.00
   c) Apr 16, 2009       45,976.00
   Total            $ 147,780.00

2) Regular installments will be paid as per schedule.

We thank you for your understanding and waiting to receive your confirmation.

Kind regards

Ali Paksima

Cc: Lisa D. Leach

Exhibit D

02/05/2009  17:11    5162220377                GCL                                    PAGE  02

## Ali Paksima

**From:**          System Administrator
**To:**            kpetersen@seacastle.com
**Sent:**          Thursday, February 05, 2009 4:56 PM
**Subject:**       Undeliverable: FW: Container Lease Purchase Payments

Your message did not reach some or all of the intended recipients.

   Subject:    FW: Container Lease Purchase Payments
   Sent:       2/5/2009 4:56 PM

The following recipient(s) could not be reached:

   'kpetersen@seacastle.com' on 2/5/2009 4:56 PM
       There was a SMTP communication problem with the recipient's email server.  Please contact your system administrator.
       <shipny01e.gogci.com #5.5.0 smtp;550 mail to kpetersen@seacastle.com not accepted here>

1

🔵 You replied on 3/30/2009 10:29 AM.

**Lisa Leach**

| | | |
|---|---|---|
| **From:** | Hormoz Shayegan [hshayegan@gogcl.com] | **Sent:** Thu 3/26/2009 9:18 AM |
| **To:** | Kara Petersen | |
| **Cc:** | | |
| **Subject:** | Seacastle/Global Container Lines Limited | |
| **Attachments:** | | |

Dear Ms. Kara Petersen,

I refer to our telephone conversation earlier this morning.

As briefly explained, the virtual collapse of the worldwide shipping market arising from the current economic turmoil, has had a pronounced affect on the Liner Trade in the Indian Ocean/Persian Gulf/East Africa areas - where GCL operates. This has severely impacted revenue and cash flow of GCL - along with other shipping companies operating in the region.

Accordingly, we are proposing rescheduling payment of the outstanding amounts to Seacastle, consistent with the company's current cash flow position, as follows:

$50,902.00  by 3/31/09
$22,988.00  by 4/30/09
$22,988.00  by 5/31/09

This is with the undertaking that should the company's cash flow situation be improved, payment of the respective amounts will be effected before the proposed due dates. We trust you will appreciate this offer in light of the current economic environment and look forward to receiving your confirmation in order to proceed.

Best regards

Hormoz Shayegan
Global Container Lines limited

**VERIFICATION**

STATE OF NEW YORK    )
                    )    ss.:
COUNTY OF NEW YORK  )

      George N. Proios being duly sworn, deposes and says:

      1.    I am a member of the bar of this Honorable Court and of the Law Offices of

George N. Proios, PLLC, attorneys for Plaintiff.

      2.    I have read the foregoing Verified Complaint and I believe the contents thereof are

true.

      3.    The reason this Verification is made by deponent and not by Plaintiff in that

Plaintiff is foreign corporation, no officers or directors of which are within this jurisdiction.

      4.    The sources of my information and belief are documents provided to me and

statements made to me by representatives of Plaintiff.

                                      George N. Proios

Sworn to before me this
30th day of October, 2009

                          **JON WERNER**
                          NOTARY PUBLIC
                          02WE6149122
                          STATE OF NEW YORK
                          COMMISSION EXPIRES
                          JULY 3RD, 20_10_

Notary Public

7